IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

-----------------------------------------------------------X
MAYHEM CRUDE, INC.                          :          Civil Case No.
                                            :
                 Plaintiff,                 :
                                            :          **ADMIRALTY**
        vs                                  :          F.R.C.P. 9(h)
                                            :
SIVA VENTURES LIMITED,                      :
DALEWORLD LIMITED; SIVA                     :
SHIPPING SINGAPORE PTE. LIMITED;  :
OPAL CHEMICALS LIMITED; SIVA                :
INDUSTRIES AND HOLDINGS LIMITED:
and SARAVANA SIVASANKARAN                   :
                                            :
                 Defendants,                :
                                            :
-----------------------------------------------------------X

## <u>ORIGINAL VERIFIED COMPLAINT</u>

COMES NOW Plaintiff, Mayhem Crude, Inc., by and through undersigned counsel, and files this Original Verified Complaint, and respectfully shows the Court as follows:

### I.        JURISDICTION, VENUE, AND PARTIES

1.        This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the breach of maritime contracts, *i.e.*, Performance Guarantees of obligations under an executed bareboat charterparty for the employment of a seagoing vessel.  This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is brought under the provisions of Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and the Federal Arbitration Act, 9 U.S.C. §§ 4 and 8 in aid of maritime arbitration.

2.      At all times material hereto, Plaintiff Mayhem Crude, Inc. (hereinafter "Plaintiff" or "Mayhem"), was a corporation organized and existing under the laws of the Republic of the Marshall Islands and the registered owner of the vessel M/T V8 STEALTH (IMO No. 9436018, Call Sign D5MT6), a crude oil tanker registered in Liberia as of January 12, 2016 (formerly of the Marshall Islands)

3.      At all times material hereto, Siva Ships International Pte. Limited (hereinafter "Charterer" or "Siva Ships"), was a foreign company organized and existing under the laws of the Republic of Singapore and was the bareboat charterer of the V8 STEALTH (hereinafter the "Vessel") pursuant to a bareboat charter party dated June 6, 2008.(hereinafter the "bareboat charter"), a copy of which is attached hereto as **Exhibit 1.**

4.      At all times material hereto, Defendant Daleworld Limited (hereinafter "Daleworld"), was a foreign company organized and existing under the laws of the Republic of Cyprus and is the guarantor of the performance of the bareboat charter obligations by Charterer Siva Ships.

5.      At all times material hereto, Defendant Siva Ventures Limited (hereinafter "SVL"), was  a foreign company organized and existing under the laws of India, State of Tamil Nadu, and is the guarantor of the performance of the Daleworld Performance Guarantee of the obligations under the bareboat charter of the Vessel by Charterer Siva Ships.

6.      At all times material hereto, Defendant Opal Chemicals Limited (hereinafter "Opal Chemicals"), was  a foreign company organized and existing under the laws of the Republic of the Marshall Islands and the owner of the vessel JBU OPAL (IMO No. 9400409, Call Sign V7IN4), a chemical/oil products tanker vessel registered in the Marshall Islands.

7.      At all times material hereto Defendant Siva Shipping Singapore, Pte. Ltd. (hereinafter "SSSPL") was a corporate entity organized and existing under the laws of Singapore and the parent

company of Siva Global Ships Ltd., which owns Defendant Opal Chemicals, the owner of the JBU OPAL.

8.     At all times material hereto, Defendant Siva Industries and Holdings Limited (hereinafter "SIHL"), was  a foreign company organized and existing under the laws of India, State of Tamil Nadu and is the controlling parent company of all of the corporate Defendants.

9.     At all times material, hereto, Defendant Saravana Sivasankaran (hereinafter, "S. Sivasankaran"), an individual and citizen of the Seychelles, was the executive director of Defendant SVL and negotiated in July 2012 on behalf of the Charterer, *inter alia*, a reduction of the charter hire rate and other contract terms in consideration of the Performance Guarantees issued by Defendants Daleworld and SVL.  Additionally, Defendant S. Sivasankaran serves as the Chief Executive Officer of Defendant SSSPL.

10.     The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, as is pled more fully below.

## II.     HISTORY OF THE SUBSTANTIVE CLAIMS

11.     In February 2008, Siva Ventures Limited acquired the Norwegian shipping firm J.B. Ugland Shipping AS (hereinafter "JBUS") from J.B. Ugland AS.  SVL also acquired the right to use the name of JBUS for three years following the acquisition.

12.     JBUS was a well-established name in the shipping industry with property interests in tangible shipping assets including several owned vessels.  JBUS pursued its business activities from the shipping centers of Oslo, Norway and Singapore.  Singapore was the center of JBUS's "chartered-in" business activity, *i.e.*, shipping activity performed with other owners' vessels, which JBUS hired

from their owners either under bareboat or time charter.  JBUS operated its chartered-in business by and through its wholly-owned subsidiary J.B. Ugland Shipping Singapore Pte. Ltd.

13.     On June 6, 2008, J.B. Ugland Shipping Singapore Pte. Ltd. chartered-in Plaintiff's vessel the V8 STEALTH, while it was in the process of being built, under a charter party dated June 6, 2008.  See Exhibit 1.

14.     J.B. Ugland Shipping Singapore Pte. Ltd was only an operator of non-owned tonnage, and Plaintiff required security for the performance of the charter obligations, so the parties agreed under Part I, Clause 27 of the bareboat charter that a "Corporate guarantee issued by J.B. Ugland Shipping AS, Oslo" should be and was attached to the bareboat charterparty.

15.     The Vessel, once construction had been completed, was duly delivered to her bareboat charterer and entered the agreed service.

16.     On or about June 3, 2011, the parties executed an amendment to the bareboat charterparty to reflect a change in the name of the charterer from J.B. Ugland Shipping Singapore Pte. Ltd to Siva Ships International Pte. Ltd., a copy of which is attached hereto as **Exhibit 2.**

17.     In October 2011, the name of J.B. Ugland Shipping AS, Oslo was changed, and this Norwegian company was renamed Siva Shipping Oslo AS.  See press report to that effect attached hereto as **Exhibit 3.**

18.     In May 2012, the Charterers represented to Plaintiff they were having difficulties with the slowdown in the tanker market and would be financially unable to continue to perform unless there were a substantial reduction in the bareboat charter hire rate from the original agreed $21,000 per day.

19.     Plaintiff's managers and Charterers' representatives met in Athens, Greece in June and July 2012 to discuss an adjustment in the daily charter hire rate and other matters concerning the remaining term of the bareboat charter.

20.     In the meetings with Plaintiff's managers, Charterers were represented by Mr. Martin Wong, a partner in the Singapore entity of the international auditing and accounting firm KPMG International Cooperative, as well as by Defendant S. Sivasankaran, who was a director of Charterer Siva Ships and the son of Mr. Chinnakannan Sivasankaran ("C. Sivasankaran"), the founder of Defendants SIHL and SVL, as well as founder and principal beneficial owner of Charterer Siva Ships and Siva Shipping Oslo AS.

21.     Messrs. Wong and S. Sivasankaran negotiated with Plaintiff's management a reduction in the daily charter hire rate payable under the bareboat charterparty to $14,800 per day or *pro rata*.  The parties also negotiated a substitution of the original guarantee of J.B. Ugland Shipping AS, Oslo with new performance guarantees provided by Defendants Daleworld and SVL.  These revisions to the terms of the bareboat charter party were reflected in bareboat charterparty Addendum No. 2, which is attached hereto as **Exhibit 4.**

22.     Messrs. Wong and S. Sivasankaran represented to Plaintiff that Defendant SIHL, an Indian corporate entity, was the ultimate holding company for the Siva Group of companies.  They reported that one level below SIHL was Defendant SVL the entity from which investments on behalf of the Siva Group are undertaken in various sectors, such as shipping, energy, et al. In the case of Charterer Siva Ships, SVL's investment was first routed through Defendant Daleworld, into Siva Shipping Oslo AS (formerly J.B. Ugland), and then finally into Charterer Siva Ships.  Messrs. Wong and S. Sivasankaran provided Plaintiff with a schematic representation of this structure, a copy of which is hereto attached as **Exhibit 5.**

23.     In order to reassure Plaintiff that the newly-proposed substitute charterparty guarantors were creditworthy business entities with the wherewithal to back the charter obligations, Messrs. Wong and S. Sivasankaran provided Plaintiff copies of the audited accounts of Defendants Daleworld, SVL, and the parent holding company SIHL, copies of which are attached hereto respectively as **Exhibits 6, 7,** and **8.**  By presenting Plaintiff these audited account records, Messrs. Wong and S. Sivasankaran sought to reassure Plaintiff that the entities in the Siva organization signing as guarantors, together with the substantial resources of this large conglomerate, stood behind Charterer Siva Ships to ensure performance of its obligations under the bareboat charterparty.

24.     Messrs. Wong and S. Sivasankaran's representations persuaded Plaintiff, who consented to the amendment of the bareboat charterparty by the addition of Addendum No. 2.  See Exhibit 4.

25.     Defendant S. Sivasankaran signed Addendum No. 2 as Director of Siva Ships. *See* Exhibit 4 at p. 2.  In accordance with the parties' agreement, Addendum No. 2 named Daleworld and SVL as guarantors of Charterer's obligations under the bareboat charterparty. *Id*. at ¶ 5.

26.     Contemporaneously with the execution of Addendum No. 2, SVL guaranteed the performance of Charterer's obligations under the bareboat charterparty, with S. Sivasankaran signing in his capacity as Director of SVL the charterparty Performance Guarantee, a copy of which is attached hereto as **Exhibit 9.**

27.     Contemporaneously with the execution of Addendum No. 2 and the above Performance Guarantee by SVL, Mr. Vaidyanathan Srinivasan also signed in his capacity as Director of Daleworld a guarantee of the performance of the charter party Performance Guarantee.  A copy of the Daleworld Performance Guarantee is attached hereto as **Exhibit 10.**  Mr. Srinivasan also served as Chief Executive Officer of SIHL and as director of SIHL's subsidiary, Defendant SVL.

28.     The respective guarantees of Defendants SVL and Daleworld expressly provide that Plaintiff's agreement to Amendment No. 2 to the bareboat charter was conditioned on the receipt of the SVL and Daleworld Performance Guarantees.

29.     The respective guarantees formed part of the consideration for Plaintiff's agreement to amend the bareboat charterparty to permit Charterer Siva Ships' continued use of Plaintiff's Vessel, the V8 STEALTH.[1]  The Daleworld and SVL Performance Guarantees incorporate by reference and expressly mention the obligations imposed under the bareboat charterparty with amendments thereto, in consideration whereof the Performance Guarantees were issued and executed.

30.     The Daleworld and SVL Performance Guarantees are thus guarantees of maritime obligations, *viz* the regular and punctual payment of the agreed bareboat charter hire at the agreed payment intervals and all other amounts accruing in favor of Owners under the bareboat charter of its Vessel.

31.     The respective Performance Guarantees call for the application of English law, with all disputes arising thereunder subject to the exclusive jurisdiction of the London Maritime Arbitrators' Association.

32.     Following the amendment to the bareboat charterparty and the issuance of the Performance Guarantees on July 17, 2012, Charterer Siva Ships obtained the benefit of the reduced hire rate for use of the V8 STEALTH, which it enjoyed for several years thereafter.

33.     Unbeknownst to Plaintiff, however, corporate control of Charterer Siva Ships was allegedly assumed by Standard Chartered Bank at some point in or about August 2016. Standard Chartered is a foreign banking entity and purportedly the holder of a charge over Charterer's shares

---

[1] The Performance Guarantees of Defendants Daleworld and SVL, in identical terms, also guarantee the performance of Siva Ships International Pte. Ltd. under a charterparty dated June 6, 2008 for another vessel, the V8 STEALTH II.

as security for loans Standard Chartered made to an affiliated entity, Siva Group Shipping and Trading, Pte. Ltd.  Thereafter, Standard Chartered installed on Charterer's board its own directors, Messrs. Cosimo Borrelli and Jason Kardachi, who are managing directors of the corporate business restructuring firm, Borrelli Walsh Limited.

34.     Under the management of Messrs. Borrelli and Kardachi, Siva Ships breached the charter party on or about December 18, 2016 when it repudiated and unilaterally terminated the contract prematurely by refusing to undertake necessary repairs to rectify numerous deficiencies in the Vessel before redelivering her to Plaintiff, including Charterer's refusal to rectify and repair extensive damage to the Vessel's hull, machinery, appliances and appurtenances at the time cost and expense of Charterer, as required under the bareboat charter party. A preliminary inspection report setting out the damage to the Vessel was delivered to Siva Ships at the time of her redelivery, which Plaintiff only accepted under protest.  Within days after the repudiation of the bareboat charter, Messrs. Borrelli and Kardachi applied on behalf of Siva Ships for the company's voluntary winding up, and on or about January 6, 2017 the Singapore court appointed liquidators.

35.     The cost of effecting the repairs is estimated to be USD $1,500,000, and the time the Vessel lost while undergoing repairs is estimated to be USD $8,000 x 55 = $ 440,000.  Moreover, because of the irregular redelivery of the Vessel, which was foisted on Plaintiff unilaterally and without proper timely notice, Plaintiff incurred extra costs and expenses associated with dispatching a full crew and superintending personnel to take over the Vessel that the bareboat charterer virtually abandoned.  The resulting extra costs and expenses are estimated to exceed USD $180,000.  Given the Vessel's irregular redelivery and the time elapsed between the purported redelivery and the actual putting of Plaintiff's crew in possession of the Vessel, 6.28750 days elapsed. (Calculated from December 12, 2016, 12:36 GMT through December 18, 2016, 19:30 GMT).  At the daily hire rate of

$14,800, Plaintiffs are entitled to $93,055.00 in respect of earned and unpaid hire, plus additional expenses. Thus, Plaintiff's total claim is in excess of USD $2,000,00.00, exclusive of interest, fees, costs, and Owners' share of Charterers' profits under Addendum No. 2, Annex A, all as will be described in further detail below.

36.     In light of the Charterer's insolvency and repudiation of the charter party, under rider clauses 10 and 11 thereof, Owners made due demand on Defendants Daleworld, SVL, and S. Sivasankaran to perform under the respective guarantees, but the Defendants have entirely failed to respond.

### III.     THE RELATIONSHIP OF THE GUARANTORS TO SIVA SHIPPING SINGAPORE PTE LTD AND THE M/T JBU OPAL

37.     At all times material hereto, Siva Group [2] (*i.e.*, Defendant SIHL) was a multinational conglomerate pursuing business endeavors in many countries across multiple industries.  According to Siva Group's self-description, its activities include business ventures in the following sectors: palm oil (Biopalm Energy); agricultural and commodities trading (RUDHRA); shipping and logistics (Siva Shipping); wind energy (WinWinD); real estate and hospitality (Siva Realty); education (Siva Institute of Frontier Technology); and e-learning (ETH).  See brochure of Siva Group hereto attached as **Exhibit 11**.

38.     In managing its diverse business Siva Group used Defendant SVL as its principal investment arm, undertaking mergers and acquisitions and overall investment management on behalf of the Siva Group.  *Id.*

---

[2] "Siva Group" is the trade name of the conglomerate.  Its corporate incarnation is Siva Industries and Holdings Limited ("SIHL").  SIHL was formerly known as Sterling Infotech Limited of Chennai, India.

39.     At all times material hereto Defendant SIHL carried on its shipping business activity by and through its wholly-owned subsidiary Siva Shipping Singapore Pte. Ltd. (SSSPL).  Much like the practice of its parent Siva Group/SIHL, "Siva Shipping" was a trade name used for business actually conducted by a number of interrelated corporate entities in the various specialized sectors within the shipping industry.  These sectors, according to Siva Shipping's self-description are: bulk transportation; chemical transportation; offshore oil exploration; and tankers and gas carriers. See Siva Shipping brochure, hereto attached as **Exhibit 12.**

40.     Defendant Siva Shipping/SSSPL, an entity existing under the laws of Singapore, served merely as a corporate face for the several interrelated Siva Group entities engaged in maritime business. According to statements Siva Shipping's principal and Chief Executive Officer, Defendant S. Sivasankaran, made at the 2011 Nor-Shipping Opening Conference:

> Siva Shipping is the flagship company of a portfolio of different shipping brands:  J.B. Ugland Shipping, which is a company we acquired… is well known in this part of the world – a mixed fleet of modern tankers, dry bulk, gas carriers, and chemical tankers; Crossbridge, which is one of the leading Asian dry bulk operators;  Siva Global Ships, which is the offshore arm of Siva Shipping; and Nordic Tankers, in which we own 20% stake and which is the fourth largest chemical tanker operator today.  Of course, Siva Shipping is only one part of the Siva Group family, which is a 3 billion dollar enterprise, twenty-five year old company, very diversified sectorally, with investments in real estate, telecom, engineering, energy, commodities, with good credit rating [and] with a very strong global presence.

See Saravana Sivasankaran, Presentation at 2011 Nor-Shipping Opening Conference, available at: https://www.youtube.com/watch?v=hVxCkw8SXFQ (last visited February 23, 2017).  Defendant S. Sivasankaran has also represented that Siva Shipping is comprised of "Siva Bulk and Siva Global Ships. Siva Bulk is one of Asia's largest dry bulk [transport] company [*sic*] with 35 to 40 ships in operation at any time. Siva Global Ships owns and operates crude tankers, chemical tankers, gas carriers and offshore ships." See copy of Linkedin posting of S. Sivasankaran, attached hereto as **Exhibit 13.**

41.     With reference to its fleet of chemical tankers, Siva Shipping/SSSPL has represented: "Siva Chemicals controls a modern fleet of 11 stainless steel vessels offering cargo capabilities.  The fleet is a mix of owned and long term charter, with purchase options"  Siva Shipping brochure hereto attached as **Exhibit 12**.   The chemical tankers that Siva lists as part of its chemical tankers fleet included the following vessels:

        - NB SIVA Rotterdam 19,900 DWT st. st. 2012

        - SIVA Chennai 19,800 DWT st. st.2012

        - SIVA Singapura 19,800 DWT st. st.2011

        - SIVA Antwerp 19,800 DWT st. st. 2011

        - Southern Koala 21.200 DWT st.st 2010

        - JBU Opal 19,800 DWT st. st. 2009

        - JBU Sapphire 19,800 DWT st. st.2009

        - JBU Onyx 19,800 DWT st. st. 2008

        - SIVA Ghent 33,600 DWT st. st. 2011

        - JBU Oslo 33,600 DWT st. st. 2010

        - SIVA Mumbai 33,600 DWT st. st.2010

*See id.*

42.     Plaintiff has diligently researched the available official public records, which show that the registered owner of the JBU OPAL is Defendant Opal Chemicals Limited, a corporate entity organized and existing under the laws of the Republic of the Marshall Islands.  See copy of vessel mortgage and associated loan agreement from the register of the Republic of the Marshall Islands, attached hereto as **Exhibit 14.**

43.     At all times material hereto, the corporate guarantor for the financing of the acquisition of the vessels JBU OPAL, JBU SAPPHIRE and JBU ONYX was Siva Shipping Singapore Pte. Ltd. See Exhibit 14 at p. 8 (Mortgage) and p. 114 (Loan Agreement).

44.     At all times material hereto, the individual who executed the mortgage for and on behalf of the borrower for the financing of the M/T JBU OPAL was Mr. Deepak Bhandari, who is the Chief Financial Officer of Defendant Siva Shipping Singapore Pte. Ltd.  Mr. Bhandari is also CFO and President of Siva Bulk Ltd.

45.      At all times material hereto, the shareholder holding 100% of the shares of the M/T JBU OPAL's owner Opal Chemicals, Ltd. is Siva Global Ships Limited.  See Exhibit 14 at p. 14.

46.     At all times material hereto, the business address of the Owner of the JBU OPAL was 8 Temasek Boulevard, # 22-02 Suntec Tower Three, Singapore 038988, which is the same address as that of Defendant Siva Shipping Singapore Pte. Ltd.  See Exhibit 14 at p. 114.

47.     At all times material hereto, the person signing the loan agreement dated July 31, 2015 for the purchase of the M/T JBU OPAL for and on behalf of Defendant SSSPL was Mr. Deepak Bhandari, who also signed for and on behalf of Opal Chemicals Ltd., as well as for additional co-borrowers, Onyx Chemicals Limited and Sapphire Chemicals Limited.  See Exhibit 14 at p. 114.

48.     At all times material hereto, Defendant S. Sivasankaran was the executive director of Defendant SVL; director of Charterer Siva Ships International Pte. Ltd; chief executive officer of Siva Investments and Holdings Ltd.; and together with his mother Jayalaksmi Sivasankaran is possessor of joint control of the Siva Group conglomerate founded by his father Chinnakannan Sivasankaran.

## IV.   REPRESENTATIONS RELATING TO THE PERFORMANCE GUARANTORS

49.    In the course of the renegotiation of the bareboat charter party Defendants SIHL, S. Sivasankaran; SVL, and Daleworld (hereinafter collectively referred to as the "Guarantor Defendants"), by and through their representative Martin Wong, made the following representations to Plaintiff on July 4, 2012 : "Siva Industries and Holdings Limited is the ultimate holding company for the Siva Group of companies, one level down is Siva Ventures Limited from which investments are undertaken in various sectors, such as shipping, energy etc. In the case of Siva Ships Intl Pte. Ltd, this investment is undertaken through Daleworld into Siva Ships Oslo (formerly JB Ugland) and then finally into Siva Ships Intl Pte. Ltd."  See e-mail correspondence of Martin Wong hereto attached as **Exhibit 15.**

50.    Along with their representations, the Guarantor Defendants provided Plaintiff a diagram of their corporate structure, a copy of which is hereto attached as Exhibit 5 and is set out in the following table:



## TABLE I

SIVA INDUSTRIES & HOLDINGS, LTD.

SIVA VENTURES, LTD.

DALEWORLD LIMITED

SIVA SHIPPING OSLO A.S. NORWAY

SIVA SHIPS INTERNATIONAL PTE LTD

51.     The Guarantor Defendants, however, did not disclose to Plaintiff and intentionally concealed from it the fact that the assets of Siva Shipping AS, Oslo, which was formerly named J.B. Ugland Shipping AS, Oslo and was Plaintiff's original performance guarantor, were being or were about to be transferred under the corporate control of other corporate entities of the Siva Group, and specifically to Defendant SSSPL. The effect of this transfer of assets is readily apparent in the following:

# TABLE II



52.     The Defendants' concealment and failure to disclosure the actual or intended transfer of the shipping assets of Plaintiff's performance guarantor, Siva Shipping AS, Oslo, to Siva Shipping Singapore, Pte. Ltd., was intentional and made for the purpose of improperly shielding these trading assets from the recourse of Plaintiff and other similarly situated creditors.

53.     The concealment from and failure to disclose to Plaintiff the transfer of the assets to the corporate control of Siva Shipping Singapore Pte. Ltd. was material inasmuch as it induced Plaintiff, acting under the reasonable belief and expectation that it had the benefit of an asset-rich

corporate guarantor, to agree to Addendum No. 2, allowing Charterer to keep possession and use of its Vessel pursuant to the bareboat charter, accepting a lower daily hire rate, and not exercising its rightful option to terminate the charterparty due to Charterer's breach of the contract by failing to pay overdue hires.

54.    The concealment from and failure to disclose to Plaintiff the transfer of these assets to the corporate control of Siva Shipping Singapore, Pte. Ltd. was also material inasmuch as it was designed to and did in fact induce Plaintiff to agree under Addendum No. 2 to discharge the performance guarantee obligations previously undertaken by Siva Shipping Oslo A.S. as the former guarantor of the charterparty.

55.    The concealment from and failure to disclose to Plaintiff the transfer of the shipping assets to the corporate control of Siva Shipping Singapore Pte. Ltd. was material inasmuch as it was designed to and did in fact induce Plaintiff to accept as substitute performance guarantors the parties Plaintiff was misled by Defendants to believe actually exercised control over the shipping assets of Siva Shipping Oslo A.S. and to which Plaintiff could look as a source of security for any claims against the performance guarantors.

56.    As alleged above, the Guarantor Defendants are under the common control of Defendant S. Sivasankaran.  Defendant S. Sivasankaran directly and personally made and/or directed the misrepresentations complained of herein in order to fraudulently induce Plaintiff to accept as guarantors the Defendants SVL and Daleworld, which are entities S. Sivasankaran dominates and controls not only as an officer and director, but also as an ultimate beneficial owner, along with his father C. Sivasankaran and his father's alleged ex-wife, Jayalakshmi Sivasankaran.

57.    Exercising domination and absolute control over Plaintiff's former guarantor, Siva Shipping Oslo A.S., Defendant S. Sivasankaran stripped that entity of, and transferred from it the

corporate control over, its shipping assets, leaving it essentially insolvent and without any assets.

58.     The misrepresentations of the Guarantor Defendants of their present intent to perform at the time they secured the issuance of the guarantees by Defendants SVL and Daleworld is manifest in their complete failure and refusal to respond to Plaintiff's demands to honor the obligations pursuant their respective Performance Guarantees.

59.     As stated above, the Defendants' actions were designed to manipulate and conceal the shipping business assets previously under their control, such that the Performance Guarantees agreed to by the Guarantor Defendants could not be, and were not intended to be, satisfied out of the corporate assets of Defendant Daleworld, making it in effect a judgment-proof, asset-less corporation.

60.     By removing and transferring the shipping assets of Siva Shipping Oslo, A.S. Norway away from the corporate control of Defendant Daleworld and under the corporate control of one of their different business entities, the Defendants engaged in a corporate shell game that has made it impossible for Plaintiff to pursue and obtain satisfaction from its performance guarantors of any judgment.  By such means, the Defendants set up a sham by which to defraud Plaintiff using the substitution of guarantors, inducing agreement to Addendum No. 2 to the bareboat charter, and stripping the shipping assets of Siva Shipping Oslo, A.S. Norway.

61.      By reason of the stripping of the shipping assets of Siva Shipping Oslo, A.S. Norway and transferring same to Siva Shipping Singapore Pte. Ltd., the latter has been constituted a successor corporation of the former by reason of its possession of the same assets; employment of identical personnel; identical business address; identical customer; identical management and common control. In short, Defendants set up the guarantors Daleworld and SVL as sham entities with the intent of perpetrating a fraud on Plaintiff in the manner similar to that outlined in *Sparling v. Doyle*, 2014 U.S. Dist. LEXIS 151113 (W.D. Tex. 2014) (holding, in a case where plaintiffs claimed that defendant

entities and individuals were alter egos of each other for purposes of liability, that the allegations should not be dismissed inasmuch as plaintiffs contended that the entities and individuals shared interchangeably corporate resources, employees, and office space; were under common control and ownership; and engaged in a sham to perpetrate fraud via a corporate shell game "involving multiple subsidiaries holding various valuable corporate assets… in an effort to manipulate corporate assets and shield them from legal liability").

## V.    UNDERLYING PROCEEDINGS ON THE MERITS

62.    Both Performance Guarantees provide for arbitration in London of all disputes arising therefrom. See Exhibits 9 and 10.

63.    Plaintiff intends to pursue its claims in London arbitration against its guarantors, Defendants Daleworld and SVL.

64.    Plaintiff estimates the legal costs that will be incurred in pursuing claims in London maritime arbitration proceedings will be approximately USD $400,000.00.   As is customary in London arbitrations, legal costs, including lawyers' fees, are awarded to the prevailing party.

65.    This action is an ancillary proceeding, brought in order to obtain jurisdiction over Defendants Daleworld and SVL, and to obtain security for Plaintiff's claims in London arbitration proceedings.

## VI.    APPLICATION FOR ATTACHMENT UNDER
## SUPPLEMENTAL ADMIRALTY RULE B

66.    None of the Defendants are or were at the time of the filing of this suit present within the District or can be found in the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Law Claims and under the laws of Texas governing personal jurisdiction. See Attorney Declaration of George A. Gaitas attached hereto as **Exhibit 17**. Nevertheless, Defendants have within the District tangible or intangible personal property in the

hands of parties who may be named garnishees in the process of maritime attachment and garnishment consisting of tangible assets, debts, credits, or effects.

67.     More specifically there is present, or imminently due to arrive in the Southern District of Texas, the M/T JBU OPAL, which is referred to above and is property of the Defendants that may be attached pursuant to process of maritime attachment and garnishment issued by this Court.

68.     Defendants S. Sivasankaran and Siva Industries & Holdings Limited have abused the purported corporate separateness and individual corporate existence of their surrogate entities, Siva Ventures Limited, Daleworld Limited, Opal Chemicals Limited, and Siva Shipping Singapore, Pte. Limited. The Defendants' purpose and intent in this regard was to undergo a fraudulent corporate restructuring and reallocation of assets designed to escape their lawful obligations under the contractual Performance Guarantees given by SVL and Daleworld, and to insulate their assets including the JBU OPAL from the reach of creditors such as Plaintiff, who sustained damages by Defendants' refusal to satisfy Charterers' unperformed obligation to pay bareboat charter hire and make necessary repairs to the V8 STEALTH prior to her redelivery to Owners..

69.     In light of Defendants' abuse of the privilege of conducting business under the corporate form and its intent to defraud its contractual counterparty, Plaintiff respectfully prays that the Court disregard the separate personality of the corporate Defendants as a sham to perpetrate a fraud, to fraudulently transfer and shield its assets from lawful creditors, and to reconstitute as a successor corporation that merely continues the business of its predecessor in employing the same assets such as the JBU OPAL.

70.     Plaintiff's claims against the Defendants arise out of the breach of maritime contracts, *i.e.*, the July 17, 2012 Daleworld and SVL Performance Guarantees.

71.     The amount of Plaintiff's claim, as best as can be reasonably estimated at present, is as follows:

|   | | |
|---|---|---|
| A.  Unpaid charter hire due and owing ………… | $ | 93,055.00 |
| B.  Costs of repairs………………….……… | $ | 1,500,000.00 |
| C.  Time lost in effecting repairs………………… | $ | 440,000.00 |
| D.  Costs and expenses due to irregular delivery… | $ | 100,000.00 |
| E.  Interest at 3.5% for 1 year……………………. | $ | 195,668.00 |
| F.  Estimated legal costs ………………………… | $ | 400,000.00 |
| G.  Additional crew salaries & transport expenses.. | $ | 89,236.00 |
| H.  Additional fees for flag inspection and certificates during detention by USCG ….......... | $ | 6,651.00 |
| **TOTAL CLAIM …………………. $** | | **2,824,610.00** |

Thus, Plaintiff's total claim against Defendants due to the breach of the maritime contracts is in the aggregate sum of USD $2,824,610.00.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays as follows:

A.     That process in due form of law and according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and that said Defendants be cited to appear and answer the allegations of this Original Verified Complaint;

B.     That since the Defendants are not present and cannot be found within this District within the meaning of Supplemental Rule B, all of the assets belonging to the Defendants presently within this District, or assets expected to come into this District during the pendency of this action, including, but not limited to, the M/T JBU OPAL and/or any other assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment

and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.     That judgment be entered against each of the Defendants in the sum of Two Million, Eight Hundred Twenty-Four Thousand, Six Hundred Ten Dollars (USD $2,824,610.00), together with all interest, fees, costs, and Owners' share of profits, be applied in satisfaction thereof;

E.     That the Court grant such other and further relief as it deems, just, equitable and proper.


                                        Respectfully Submitted,

Date:   February 24, 2017               CHALOS & CO, P.C.
        Houston, TX

                              By:     /s/ George A. Gaitas
                                      George A. Gaitas
                                      State Bar No. 24058885
                                      Federal Bar No. 705176
                                      Sean D. Kennedy
                                      State Bar No. 24102006
                                      Federal Bar No. 1007545
                                      Jonathan M. Chalos
                                      State Bar No. 24097482
                                      Federal Bar No. 3008683
                                      7210 Tickner Street
                                      Houston, Texas 77055
                                      Telephone: 713-936-2427
                                      Fax: 866-702-4577
                                      E-mail:  georgegaitas@chaloslaw.com
                                               sdk@chaloslaw.com
                                               jmc@chaloslaw.com